May it please the Court, the federal government is one of limited powers. In this case, though, Circle 8 wants the Court to hold, as a matter of law, that the Secretary of Transportation has the power to regulate the qualifications and maximum hours of service for workers who maintain and repair construction and industrial equipment. The Secretary has not done so, ever, and there's no textual support for that position that he can so regulate in either the Fair Labor Standards Act or the Motor Carrier Act. So there's no case in all of America in which someone's been held to be part of the Motor Carrier Act when it's fixing something else on the vehicle that's not part of the motor, etc.? Your Honor, there's no case that I'm aware of that involves crane mechanics. What's the closest analogy to crane mechanics that came out against you? It came out against us. I don't, I mean, they analogize them to vehicle mechanics, Your Honor. Right, but you separated that out, vehicle, because it's not the motor or the engine or something about the vehicle. It's something that's a separate apparatus. Right, it's mechanically independent from the vehicle. And I think, I don't know what the most analogous example is that would cut against us. I can tell you the example that we used in the brief was a gunsmith working on a heavy piece of heavy artillery attached to a vehicle. There wouldn't be any dispute that that person doesn't affect the safe operation of a vehicle in interstate commerce. What's your best case? Your Honor, I would point the court to two. One's an older case, Wirtz v. Tyler Pipe and Foundry Company, cited in the brief on pages 19 to 20. It's a case out of this court where the court held that the Secretary of Transportation did not have the power to regulate construction or industrial equipment like front-end loaders and things like that. And I would also point the court to the Olibas v. Barclay case. That was actually a jury trial that this court affirmed where the evidence, I feel like with the quality of the evidence, was better and it was stronger in favor of applying the exemption than the evidence in this case. In fact, there was evidence that those, they were drivers in that case, actually drove in interstate commerce, but they still nonetheless affirmed the jury's verdict that the workers were not exempt under the motor carrier exemption. Now, is there some evidence in the record that Mr. Cunningham performed repairs, maintenance, inspections and adjustments to the truck chassis itself and not to just the crane? And does that make your case harder? No, Your Honor. Well, let me take the first part of the question. I think there's some evidence in the record that he did that with respect to his service truck, and there's a regulation on point that says working on your own service truck isn't going to qualify the employer's service truck that you use to transport yourself between points in different states isn't going to get you there. But it's not the vehicle with the crane on it? No, there's some evidence that he took a picture, I think, one of the pieces of evidence was he said, okay, the tires look worn on this particular crane, the actual tires that they use to travel over the interstate. So he took a picture and sent it to dispatch and said, we should look at getting these replaced. Okay, so to clarify, I had the same question Judge Elrod did, because I thought his own testimony was that he performed safety enhancing work on the motor vehicles themselves, not just his own truck, but wheels, axles, transmissions, starters, you know? Your Honor, I think the testimony is a little unclear. I think in context he was talking about that equipment that's part of the mobile crane that's permanently affixed to the truck chassis. Like I said, there was some evidence where he, for example, snapped a picture of some tires. I think maybe he changed the light bulb once and maybe replaced some wiper blades. But with respect to mechanics, there's a whole list of duties and the exemptions. Let me back up. Not just every employee of a motor carrier is going to qualify for this exemption. The exemption is limited to drivers, mechanics, and loaders. But not just all mechanics and loaders. You have to do certain types of work that actually affect, and I think the language uses the word directly, affects the safe operation of a commercial motor vehicle in interstate commerce. On some level of abstraction, everything someone does is going to affect the safe operation of a commercial vehicle in interstate commerce. But that isn't the test. You have to directly affect the safe operation of the vehicle in interstate commerce. And so the regulation lists things like, you know, changing the oil and painting the vehicle as non-qualifying duties, and then it lists other types of duties as those that would qualify the employee for the exemption. And remember, this case is coming to you on a affirmative defense. And in this case, the magistrate judge actually sided with my client, Mr. Cunningham, and said no, the motion should be denied as to the motor carrier exemption. And Circle 8 objected. The district court has sustained the objection. So, if there's evidence that cuts both ways, it's the quintessential fact issue for a jury. Is there evidence that cuts your way? Sure, Your Honor. I think if you look at Mr. Cunningham's deposition testimony, and they talk about the types of things he did in repair of the crane, which was undisputedly his primary duty. In fact, he had to go to some special training that was sponsored by the crane manufacturers. He said if there was a problem scoping the boom on the crane, that's something that I would address. Or if we had a lost telestatus, and I'm still today unclear as to what that means, but it certainly doesn't affect the safe operation of the actual vehicle in interstate commerce. He says if there's problems scoping the outriggers, leveling the crane with the winches on the crane, if there's software issues with the crane's operating system, I can troubleshoot those remotely with an app or from my computer anywhere in the country. And a lot of times, I can repair those . . . actually do the repair remotely, order a download or whatever the case is. And I think if you compare that set of duties, which is what he was specialized in, and what he testified he did every day, day in and day out, and is how the company made money off of the services he provided, and you compare those to the list of exemption qualifying duties in the regulations, you're going to say, like the magistrate judge found and say, this is pretty different. At a minimum, we need a full trial on the merits to determine . . . Why was he called out there? Excuse me? Why was he there? Why was my . . . Why is he ever out there? Because you said he could do all these things remotely. Service vehicles sometimes. A lot of the stuff he could do remotely, but some of the things required an in-person visit, just like most things these days. I mean, you have smart devices all over the world. But if the vehicle doesn't start, he's not going to be the person. That is . . . and that's an important point, Judge. Circle Eight actually had, they had about, at least when Mr. Cunningham was there, nine mechanics. They had three crane mechanics who only worked on the crane apparatus, and they had six vehicle mechanics who did traditional work on the vehicles, things that are almost certainly exemption-qualifying, like fixing a starter, things like that. The other . . . Does it matter that this crane is permanently affixed to the vehicle? It's not something that's hauled on and off and other equipment is put on the vehicle regularly? I mean, I think you might have an easier case if it's only sometimes on this vehicle. Let me answer that question two ways, Your Honor. The training that Mr. Cunningham received would have enabled him to work on cranes that were permanently affixed and cranes that weren't permanently affixed. In other words, the presence of the vehicle isn't something that he's typically concerned about. And I'll say, too, in answer to that question, there's a case that Circle Eight highlighted, and it's a brief. I think it's on 10th Circuit. And not only is that case not bad for us, it's actually really good for us because it parrots our argument. In that case, the crane company, which did a lot of the same types of stuff as Circle Eight in this case, the crane company disputed that it was a carrier subject to the Department of Transportation's regulations. And they got to that position legally by saying, the crane is permanently affixed to the vehicle, so we're not transporting any property across state lines. So that's one of the reasons you can't exercise jurisdiction over us. We're not a carrier. We're not transporting property. We just have these big trucks. The 10th Circuit said, no, the property is permanently affixed to the vehicle. That's what you're transporting. It doesn't matter that it's permanently affixed. It's still property. That's the same argument we made in response to the summary judgment motion. We said, Mr. Cunningham is responsible for servicing the property that is transported by the truck, and not the truck's. Okay. What's your best response to the red brief page 23 to 24, where they have this list of the abundance of evidence in the record proving that Cunningham's activities in the ordinary course of his work as a mechanic qualifies directly affecting safety? You know, they have that kind of chart in their brief. What's your best response to that? It's exactly what I was saying to Judge Elrod, Your Honor. Mr. Cunningham had very specialized knowledge. His job was to fix the crane, which is mechanically independent from the vehicle. Sure, if he saw, like any person saw, that a tire was bald, he's going to let somebody know. If someone needed a spare hand, one of the vehicle mechanics that was actually responsible in the company's organization for repairing the vehicle, the vehicle part of the apparatus, yeah, he might help out. What's your specialized in? I mean, I'm board certified in Texas in consumer and commercial law, but I also handle criminal cases and, you know, immigration cases and a big long list of cases as a judge, so the fact that I had some specialty doesn't change what I do as a judge, right? So I don't know that the fact that he's got a specialty means that's all he does, right? That's true, but if you read his deposition testimony, and I think this didn't come out in their brief, obviously, but he said, I'm responsible for the crane. That's what I do. The crane, day in and day out, every day. In fact, Circle 8 has a fleet of, I don't remember exactly how many, it was a large number of cranes with three crane mechanics. It defies common sense that he's going to be out there doing things that the vehicle mechanics do, for which there are six in the company every day, three specialized crane mechanics, a fleet of cranes, and he's a big money maker for the business judge. Why would they pay him the salary that they paid him, which was a substantial sum of money, well over and above what a vehicle mechanic would earn if he's really only doing the vehicle mechanic work on these, I really want to say it was 25 or 30 different cranes during the course of his employment. That makes no sense, and a jury could conclude, just like the jury did in Olibas, that, hey, yeah, you might do some of this, but it's not enough to get you there, and I think, too, Judge, if you think about any special purpose vehicle, whether it's a crane or mining equipment or a food truck or a dump truck or a concrete truck, they all have mechanically independent systems affixed to the vehicles. If we really wanted to exempt every employee of a motor carrier who did anything, Congress could have done it, but they chose not to. They chose to exempt only those workers who directly affect the safe operation of a vehicle in interstate commerce, and when the Secretary chooses to regulate, the things, the types of things he regulates, in terms of the qualifications of the employees, you typically look at drivers. I'm sorry, did you? Well, no, I guess, I mean, to me it just seems a little bit hard to think that the giant crane on top of the vehicle is irrelevant to the safety on the highway. I mean, is that your contention? Yes, Judge. I mean, there was testimony from Do you want to be behind a crane that's about to fall on you? No, but you're talking about the actual mounting of the crane on the vehicle. The crane could be completely inoperable. It could be a bunch of scrap metal, but the vehicle could still travel and travel safely between two points. Conversely, if you're on a construction site, perhaps the vehicle is broken. They've got the outriggers out, the crane's going to work, but the vehicle, for some reason, doesn't work. The crane operator can still get out there on that crane and do his job, even though the vehicle doesn't operate at all. They're two completely independent systems, and I, you know, if you want to conceptually think of a crane that's, because they have cranes that size that aren't permanently attached to the vehicles, there would be no dispute, not at all, that what Mr. Cunningham did day in and day out didn't qualify him for the exemption, but simply because it's permanently affixed to the truck chassis, like the 10th Circuit said in that Midwest crane and rigging case, it's still property. It's mechanically independent, so to the extent that repairs or anything like that are going to be done to the equipment, they don't affect the vehicle. And I did want to talk briefly about when the Secretary of Transportation, I think this is important from an analytical perspective, when he does regulate the qualifications or hours of service for transportation workers, which is what this exemption is, an exemption for transportation workers, he, we typically think of drivers, and he regulates things like their eyesight, their physical condition, their ability to read and write English, age, and when he regulates the hours of work for drivers, it sets an upper limit with the goal of avoiding driver fatigue. Are we really going to say that someone like Mr. Cunningham, a crane mechanic, is the type of person that the Secretary would regulate or has the power to regulate? I think the answer is no, and I think a jury could so conclude, and I'll reserve the remainder of my time. Thank you. You've saved time for rebuttal. Good afternoon, Your Honors. I'm David Jordan with Circle 8 Crane Services. Thank you for having us. There's one issue before the Court today. Did the District Court err in concluding that there was no genuine issue of material fact as to whether the plaintiff performed duties that directly affected the safe operation of motor vehicles and the transportation of property on public highways? Why doesn't the deposition create a fact issue? Well, frankly, Judge Elrod, the deposition is, if you're speaking of the appellate's deposition, Mr. Cunningham's deposition. Yes, why doesn't Mr. Cunningham's deposition create a fact issue on an issue that you bear the burden on such that summary judgment was not appropriate here? Judge Elrod, Mr. Cunningham's deposition testimony was consistent with the testimony of management regarding his duties. Repeatedly, and with regards to appellant's argument just a minute ago, Mr. Cunningham testified that he regularly performed duties on items such as brakes, steering, windshields, wipers, motors, tires, transmissions, wheels, axles, and lights, and other hydraulic, pneumatic, and electrical systems. Is that in a pinch or is that part of his regular duties? He said he performed those duties as part of his regular job. And I take issue with some of the characterizations of the deposition testimony. Like Judge Counts did the same in his order where he said there is no fact dispute between the parties. The question is, to what extent do these facts lead to a particular legal conclusion? And a careful read of the plaintiff's, Mr. Cunningham's papers don't reveal citations to the records that reveal any differently. And if you look at Judge Counts' order, when he talks about Mr. Cunningham's duties, he cites to dozens of sites in the record as to Mr. Cunningham's admissions with regards to his work on these self-propelled, unified cranes. Does he make more money than the regular mechanics? So, that's a fair point, Judge Alrod. We do pay our crane mechanics, these people that perform not just regular maintenance duties but have to understand these highly sophisticated crane systems. But he said to have special software training that maybe they don't have to have. They have to understand the systems. They are sent off to training. Right. The crane operators have to have a bunch of special training. There's no doubt. There's no doubt that you can't pull a mechanic off the street to work on these. So, why would it be, why would the company have him working on regular brake systems and things if he's more expensive and he's specialized? So, in the record, it's clear that he's responsible for the entire unified system. This idea that he was only responsible for one independent piece of this unified unit. You're saying the whole vehicle is a unified unit? You're saying the whole vehicle is a unified unit? That's exactly how the Tenth Circuit described it in Midwest versus the Federal Motor Carrier Safety Administration case. And that's also how the Federal Motor Carrier Safety . . . But the battery goes dead. He's not supposed to call the guy to do that? He's supposed to fix that? That's not true at all. It is his responsibility. That's what I'm asking. Yeah, it's his responsibility to service the entire unit. In fact, the chart that Judge Haynes referenced, and we see it at tab seven of Exhibit E that circulates in motion for summary judgment reply, gives repeated examples of work he did with regards to specific cranes, things like . . . He was talking . . . We're talking about cranes. Are we talking about cranes or are we talking about trucks with cranes on them? The entire unit. And I'll give you some examples. It's a great question, Judge Elrod. He changed radiators, low and high beam highlights, light halogen lamps, windshields, did annual inspections on the entire vehicle, auto glass, changed tires, steering levers, headlight fronts. I've just looked at the first third of this chart. Whenever he says that he's talking about his own vehicle that gets him out to the scene or something . . . This particular tab actually references the crane numbers in the third, the last column on the chart. Does the truck have a number and the crane has a number? The truck may have its own number, but we've identified crane numbers and there's deposition testimony and affidavit testimony to basically support this chart that we've put together. There's record sites. This chart is something y'all put together for purposes of litigation, right? But we've produced every single record underlining this and supported it with testimony to authenticate the documents. We've produced hundreds and hundreds of purchase orders, dozens of text messages, GPS records, a large number of documents to demonstrate that it is clear from the record. And by the way, it was clear in the briefing all along what his job was. It's now just in this appellate briefing that we see him distancing himself from what was regular maintenance on the entire unit of the crane. It was so clear, why did the magistrate judge rule differently? Well, if you read the magistrate's order carefully, you'll note the magistrate was concerned about whether the crane was operable at the time it was being moved down the highway. As Judge Count said, it was illogical to assume that this was an issue that mattered. If you look at the Tenth Circuit case carefully, they do the same thing. They talk about this idea being one entire unified unit going down the road. It's also an important issue because when you think about this vehicle moving down the road with this big piece of equipment that's permanently affixed and working in a unified way, the mechanics that work on that particular equipment have to make sure it's properly secured. If they don't, right, as you suggested, that piece of equipment fails, something falls off, kills a family in a minivan driving down the highway. Remember under the Federal Motor Carrier Act... And then you said that didn't matter, your opponent. I'm sorry? Your opponent said it didn't matter if they killed someone on the highway. Well, I think that's precisely what the FMCSA is concerned about, right, is safety on the public highway. And the regulations and the informative statutes on this point are very clear. This is about safety on a public highway. And with regards to equipment failing, it's not just the tires. It's not just the steering. It's not just the windshields. It's not just the lights, all of which he testified he performed regularly or from time to time, which is the regulatory framework for the coverage under the Motor Carrier Act. But if a piece of equipment on that crane itself fails, then it also could fail and cause damage on the public highways. And Mr. Cunningham himself testified to that point. He said everything he does on that crane is about safety. And if you think about what the entire regulatory framework of the Motor Carrier Act, it covers drivers, it covers helpers, it covers mechanics, and it covers loaders. And I mention that point because it's critical that we think about what that equipment needs to have done to it as it drives down the highway. It has to be secured so that nothing on that equipment fails at all while it's driving down the hallway, the highway. So if the boom swings— But loading is a particular job related to making sure things don't fall off and kill people. That's a different job than doing the software on the crane. And so that's why I'm trying to figure this out. So I don't think that that—I think that actually cuts against you that there's a specific designated person on the loaders whose job is specifically to make sure they don't—but neither here nor there. The question I have is, what is your best case that these are treated—is the 10th Circuit your best case that they're treated as one for all purposes under this act? Absolutely, Your Honor. If you read that case carefully, the Midwest was trying to argue that because the crane is attached to the chassis, it was not property. And therefore, the chassis was not transporting property down the highway and fall within the coverage. The 10th Circuit noted the uniqueness of the argument but said it can't possibly be. That by safely securing the crane to the truck chassis, that somehow it sweeps out of jurisdiction. Well, to me— Extremely large, dangerous piece of equipment. —the person that computer services the thing to work, though. They seem different people to me. Well, Judge Alrod, I mean, I would respectfully disagree. This point about the software, right? This idea that— They're running how the crane works internally and it's a sophisticated piece—device. I don't disagree that there's unique software requirements that Mr. Cunningham had to understand. But he was also doing routine work, changing the tires. Well, that's what I'm going to check the record to see if he's changing tires on the vehicle itself or if it's on his side vehicle and clarify that. That's a good thing for me to go look at. I think it is, Your Honor. And tab 7 is a perfect example of that where we outline precisely those types of duties and examples. I think we have excerpts in our brief that demonstrate that. Do you have any cases where something like a person who operated something that is attached to a vehicle was found to have the exemption under the Motor Carriers Act, something attached to a vehicle? Your Honor, there's not a— Not a person who loaded the attachment, but a person whose job is about the thing that is attached or being carried. Let me make two points. The first point about the loading is only to illustrate this idea that because it's secure, this idea that the equipment has to be secure, the boom has to be secure, everything on it has to be operational, that ultimately the Motor Carrier Act is concerned about that entire unit moving safely down the freeway without fail. Okay. With regards to your point, there are cases other than the Tenth Circuit case I've talked about dealing with cranes affixed to a chuck chassis. I will tell you, he does raise two cases that I wanted to mention that are not the same. He mentioned the Works v. Tyler pipe case. That was a case where the forklifts and the front-end loaders actually sit on top of a flatbed trailer, right? They don't themselves drive down— The forklift operator is not titled—you wouldn't argue this exemption for them? No, but the mechanic, yeah. I would not argue that— The mechanic on the forklift, you would not argue, is subject to this exemption? Not unless you get it up to 60 miles an hour and put it on— Okay, that's where the, you know, so the issue is, and is that because it's just sitting on top of it and not permanently affixed? Is that your distinction? Well, the idea is it's not being propelled down a freeway on the public highways in interstate commerce. So here— What if they're moving the forklift? If a—so arguably, if a forklift weighed over 10,000 pounds and was traveling down public highways in interstate commerce, then absolutely, it would fall under the FMCSA's jurisdiction. The Secretary of Transportation would have jurisdiction. What if it's something being carried, though? Yeah, I would agree with you, Judge Alrod. Something—and that was the point I was making about Works v. Tyler pipe. Simply placing a front-end loader or placing a forklift or placing a truck on top of a flatbed trailer does not then convert the work on that truck into mechanic work covered by the Motor Carrier Act. So then, it's—is the crane more like something being carried on the truck, or is it more like part of the truck? Oh, it's clearly one unified vehicle self-propelling down the road. As Judge Counts mentioned in his district court order, there's one set of tires, right? Just like there's one set of tires, there's one set of steering, there's one light bulb, and there's one windshield. And ultimately, his work on any of those systems, all of those interrelated systems, is going to affect how that mobile crane safely drives down the interstate across state lines. I'd like to move on, though, to a second point. Um, the plaintiffs have—sorry, the appellants here have tried to suggest that the analysis here is a week-by-week requirement, and that is a departure from the law. As circulates noted throughout its litigation and its briefing in this case, the Department of Labor and the Department of Transportation have a much different standard, and this court has already repeated this in multiple holdings. This court has said it's the character and not the frequency, or the proportion of time or activities that control. And we see that in Allen v. Coil Tubing, the Sanger case, as well as in the regulations themselves. And the U.S. Supreme Court in Levinson and this court in Sanger saw the numbers of workers driving interstate as low as 2.75% of the workforce and 4%, respectively, sufficient to extend coverage to workers that could be called upon to perform such duties in any given week. And the DOL rule is straightforward. Are they likely to be called upon regularly or from time to time? And we see that in 782.2b3. And as this court noted in Allen v. Coil Tubing, the Motor Carrier Act can apply even in work weeks where no safety-affecting work is done at all. But more importantly, this is a really important point, Your Honors, the Department of Labor has ceded this rule to the Department of Transportation's interpretation, noting that the Secretary of Transportation has jurisdiction over an employee for a four-month period, beginning when the employee did or could have been called upon to perform safety-affecting duties. We see that in the DOL fact sheet number 19. We also see that in the DOT's publication contained within 49 Federal Register 37-902 from July 23, 1981. So under the appropriate four-month rule, which we brief, Circle 8 dunks the ball. But even under Appellant's wrong week-by-week standard, which we've discussed earlier, Circle 8 still makes the shot with the piles of uncontested evidence as to his work on a week-by-week-by-week basis. So what's the conclusion this court should reach with regards to that? That even if he performs some duties on that motor vehicle, on items like steering and tires and brakes, if he does that within the Department of Transportation's four-month rule, Circle 8 prevails. There's one other reason this court can affirm, and you heard the appellant mention it. Mr. Cunningham drove a service truck over 10,000 pounds, and he serviced that truck. The record is clear that this truck crossed state lines carrying not just Mr. Cunningham, but property, equipment, and tools. And you don't see that mentioned in Appellant's brief. The truck, and this record is clear here, the truck had a small crane mounted in the back to make repairs and maintenance to transmissions, pumps, and motors. This is all right out of the record. What Mr. Cunningham called his second set of hands. Appellant's briefing goes out of its way to persuade this court that he's only moving himself, but the record reveals otherwise. And this movement of property falls within the driver coverage of the Motor Carrier Act under 29 CFR 782.2. Appellant testified there he also repaired this service truck, and Judge Allred, I believe you mentioned that earlier. He repaired that truck's wipers, transmissions, wheels, and axles. And testified he drove that truck with the property attached at least once a week out of state, and produced toll receipts showing the same. The record also shows GPS records and where his service truck went. We also included a list of invoices of non-Texas Circulate customers. Can you remind us what the magistrate judge in the district court concluded on this argument that you're making now? I would have to look at the record with regards to that point. We know that Judge Counts did not make a conclusion with regards to this point because he ruled otherwise. But we can rule on it because it was before the district court, right? Absolutely, Your Honor. Yeah. Right, and why, I mean, doesn't that seem a lot easier? I think it does, Your Honor. I mean, I think there's two very clear bases. And plaintiffs have... Okay, are you looking up about the magistrate? I can look it up. I'm happy. No, I'm not looking it up. I was just going to say with regards to appellants, they have suggested, and rightly so, there is a phrase within 782.2 that says, look, if you're just driving yourself across state lines in a big old truck, that's not enough. You have to haul property. And here, it's clear that he's hauling property, both equipment and tools, with regards to servicing vehicles as he crosses state lines. I'm happy to answer any remaining questions you may have in the final minute. Thank you. I believe we have your argument. Thank you very much. Thank you, Your Honor. I'd like to pick up where my colleague left off about the service truck. There is a reg squarely on point that says, traveling in a service truck to service your employer's equipment, which is what Mr. Cunningham did, doesn't qualify you for the exemption. The example that the regulation gives is a person who services, I think, refrigeration equipment, carry tools and supplies in himself across state lines in a service vehicle to service his employer's equipment. The department, the cases that are cited in the regs as explanations say that's not enough. That's not going to get you there. The other thing I wanted to point out, this case is not about safety. That is a complete, sort of a false narrative that my colleague has been pushing for a couple of reasons. Again, the Secretary of Transportation hasn't regulated people like Mr. Cunningham, crane mechanics. Second, the claim that unless Circle 8 is categorically entitled as a matter of law to pay its workers like Mr. Cunningham below the national standard, somehow incentivizes safety doesn't make any sense. I mean, normally if you want to incentivize someone to be safer, the way you do it in the employment context typically is with money. And there are tons of states, numerous states. New Mexico comes to mind, particularly because Mr. Cunningham worked in New Mexico where they don't have the equivalent of the motor carrier exemption, so people who work for carriers are entitled to overtime under state law. There's no evidence. We don't get to decide whether the regulation actually makes public policy sense or not. That's not on our list. Right, but the point is he kept saying that entitlement to the exemption promotes safety and it's just not true. There's no evidence. It's either entitled or not. Right. I want to spend the last sort of bit of my time talking about this idea that if Mr. Cunningham is actually called upon in the exercise of his duties to do something that affected the safe—directly affected the safe operation of a commercial motor vehicle, he's exempt. That, that is not the law and somehow it's somewhere we got off track. I did a deep dive into this issue because I was—there's no textual support for it in either the Motor Carrier Act or the Fair Labor Standards Act. So where did it come from? Was it some sort of judicial gloss or overlay that the courts have applied to this exemption? I found it in one place in the regulations, 29 CFR 782.2b3, and I commend that regulation to your careful study because if you look, it only applies to common carriers. Only applies to common carriers. In the late 40s, 1947, there was a lot of Supreme Court action on this particular exemption and I'm thinking of Morris v. McComb, Pyramid Motor Freight Corp., Company v. Ispas, and if you read the decisions carefully where they use that same language, they're applying it to common carriers. And if you think about it practically from an application perspective, that makes a ton of sense. If you're a loader or a mechanic for a common carrier who has inter- and intrastate routes and you show up to work every day, sure, you could be reasonably called upon to work on truck A or truck B. You don't necessarily know where they're going. They might go interstate. They might go intrastate. But you're not going to approach your job any differently. The same is not true for private or contract carriers. They're not obligated to take anything they don't want to take. And that helps, too, to explain some of the Court's opinions that seem a tension on this particular subject. Take the Olibas case we talked about earlier, and then you can look at another unpublished opinion from this Court, Lucas v. Noype, where you had two people who transported office court said they were exempt under the motor carrier exemption because they could be reasonably called upon. It doesn't make a lot of sense. Quick question. Yes. Mr. Jordan mentioned when he was at the podium, he mentioned your argument that Circle VIII has to show that your client was exempt for each week of his employment. And I just wondered where that per-work-week requirement comes. I mean, what legal authority is there for that per-work-week requirement for the exemption to apply? Your Honor, I'll be the first to acknowledge that there's a precedent, a circuit in this precedent that's at tension with my argument. However, there is a specific regulation for this exemption, 29 CFR 782.2b.3-4, I think, that says this particular exemption is determined on a work-week basis. And that's sort of the foundation of the Act, everything determined on a work-week basis. Okay. And if you'll permit me to finish my answer to your question earlier, Your Honor. Go ahead. The last point I wanted to make about this reasonably could be called upon, if we don't put some guardrails on this exemption, we're going to get into a place where a national law firm with national clients registers as a motor carrier, buys an F-350 and says, you know what, if we need your case file for a deposition, we might call upon a paralegal to transfer it to Austin, to New Orleans, and we might do that once every quarter or every six months. And so we could reasonably call on you to do this, and you are therefore exempt under the motor carrier exemption. That's not, they're not transportation workers, and for those reasons, we'd ask the Court to reverse. Thank you. We have your argument. This case is submitted.